IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **EYECAREPRO, INC.,** | § § | |
| *Plaintiff/Counter-defendant* | § § | |
| vs. | § § | CIVIL ACTION NO. 4:23-cv-2287 |
| | § § | |
| **STEVEN C. POLEY and DOE CO.,** | § § § | |
| *Defendants* | § § | |

## DEFENDANT STEVEN C. POLEY'S AMENDED COUNTERCLAIMS

Defendant/Counter-plaintiff Steven C. Poley ("Poley") asserts counterclaims against Plaintiff/Counter-defendant EyeCarePro, Inc. ("ECP"), as follows:

### JURISDICTION AND VENUE

1. The parties contractually consented to the jurisdiction of this Court, which may exercise diversity jurisdiction over Poley's counterclaim pursuant to 28 U.S.C. §1332 because the amount in controversy exceeds the minimum amount specified by that statute (exclusive of interest and costs), and the parties are diverse.

2. The parties contractually consented to venue in this district, which is proper pursuant to 28 U.S.C. 1391(b)(1) because counterclaimant resides in Houston, Texas.

### THE PARTIES

3. ECP is a corporation formed under the laws of the Province of Ontario, Canada, with a registered business address at 70 North Meadow Crescent, Thornhill, Ontario L4J 3B1, Canada. ECP has appeared in this lawsuit.

1

4.  Poley is a resident of Houston, Texas, who resides at 15503 Bonnie Park Court, Houston, Texas 77068. Poley has appeared in this lawsuit.

### RELEVANT FACTS

5.  Poley became an employee and Director of ECP in March 2017, when ECP acquired the assets of BidmyGlasses, Inc. ("BmG"), a closely owned Texas corporation primarily owned by Poley, who personally held 68% of the shares at the time of the agreement (hereinafter referred to as the "Transaction"). As consideration for the Transaction, BmG received a 20% stake in ECP. The terms of this Transaction were memorialized in an Asset Purchase Agreement that took effect on March 14, 2017.

6.  As a part of the Transaction, BmG and the other shareholders in ECP signed a Shareholders' Agreement entitled "Amended and Restated Unanimous Shareholders' Agreement" ("the "Shareholders' Agreement"). The Shareholders Agreement took effect on March 14, 2017.[1]

7.  On May 16, 2023, the Shareholders' Agreement was amended by a document entitled "Amendment to EyeCarePro Inc. Amended and Restated Unanimous Shareholders' Agreement" (the "Amended Shareholders' Agreement").[2] ECP, through its counsel, informed BmG and Poley of this in a letter dated May 22, 2023.[3]

---

[1] *See* Exhibit 1.
[2] *See* Exhibit 2.
[3] *See* Exhibit 3.

8. All ECP shareholders (other than Poley) approved of the May 22, 2023 letter before ECP sent the May 22, 2023 letter to BmG and Poley.

9. The May 22, 2023 letter was sent on behalf of ECP and all of its shareholders (other than Poley).

10. The May 22, 2023 letter stated that it "accepted' and "acknowledged" Poley's resignation from ECP.

11. On May 25, 2023, Poley's resignation from ECP took effect. By this date, all ECP shareholders knew that Poley had resigned from ECP.

12. After resigning from ECP, Poley took steps to sell all of BmG's shares in ECP to a third party named Randall Peterson. This sale was never completed.

13. The Amended Shareholders' Agreement included Section 6.1, which is entitled, "Sale of Shares on Triggering Event."

14. Section 6.1 of the Amended Shareholders' Agreement states that a shareholder of ECP becomes a "Defaulting Shareholder" following any "Triggering Event" as that term ("Triggering Event") is defined by the Shareholders' Agreement, as amended.

15. Pursuant to Section 6.1 of the Amended Shareholders' Agreement, Poley's resignation from ECP was a "Triggering Event."

16. The Amended Shareholders' Agreement states that a Triggering Event authorizes ECP and ECP shareholders the option to redeem another shareholder's shares in ECP, with or without that shareholder's consent, but only in accordance

with the terms, conditions, and procedures specified in Section 6 of the Amended Shareholders' Agreement.

17. Pursuant to Section 6.1(b) of the Amended Shareholders' Agreement, any attempt by ECP shareholders to forcibly purchase shares in ECP from another shareholder following a Triggering Event (i.e., without first obtaining the selling shareholder's consent) must be made within 180 days after the Triggering Event. Section 6.1(b) of the Amended Shareholders' Agreement defines this 180-day period as the "Special Shareholders Trigger Option Exercise Period."

18. Pursuant to Section 6.1(d) of the Amended Shareholders' Agreement, any attempt by ECP to forcibly purchase shares in ECP from a shareholder following a Triggering Event (i.e., without first obtaining the selling shareholder's consent) must be made within 30 days after the 180-day Special Shareholders Trigger Option Exercise Period ends. Section 6.1(d) of the Amended Shareholders' Agreement defines this 30-day period as the "Corporation's Trigger Option Exercise Period."

19. The following excerpt is a true and correct cut-and-paste from the Amended Shareholders Agreement and contains the entirety of the amendments to Sections 6.1 and 6.2 as they appear in the Amended Shareholders' Agreement:[4]

---

[4] *See* <u>Exhibit 2</u>, pp. 20-23.

10. <u>AMENDMENT OF SECTIONS 6.1 AND 6.2 OF THE INITIAL SHAREHOLDERS AGREEMENT</u>

Sections 6.1 and 6.2 of the Initial Shareholders Agreement are hereby amended and modified to read in their entireties as follows:

"6.1　Sale of Shares on Triggering Event.

(a) In the event that any Shareholder or any Affiliate of a Shareholder who is an individual employed or engaged as an independent contractor by the Corporation, as applicable (such Shareholder shall, upon the occurrence of a Triggering Event as defined below, be a "**Defaulting Shareholder**"):

(i) is declared bankrupt, commits an act of insolvency within the meaning of any bankruptcy and insolvency legislation, is petitioned into bankruptcy and such petition is not contested in good faith or a receiving order is made, is placed in receivership, makes an assignment of his or her property for the benefit of his or her creditors generally, files a petition or makes a proposal under any bankruptcy and insolvency legislation, makes an application under the *Companies' Creditors Arrangement Act* (Canada) or similar law of any other jurisdiction, or steps are taken or proceedings are initiated for its dissolution, winding-up or other termination or for the liquidation of its assets;

(ii) is the subject of a seizure of the Shares or any interest therein such Shareholder holds in the capital stock of the Corporation and such seizure is not contested in good faith within ten (10) days following the date of such seizure or if, following such contestation and judgment rendered, a third party appropriates the said Shares;

(iii) is prevented from carrying on and performing his or her obligations to the Corporation or is unable to manage such his or her own affairs by reason of his or her Disability or death;

(iv) transfers (voluntarily or involuntarily) all or any of its Shares to any third party in a manner not permitted by this Agreement;

(v) has an application or proceeding brought by a party to this Agreement or the Spouse or former Spouse of such Shareholder under the *Family Law Act* (Ontario) or under any other applicable law which may affect property rights

between Spouses or former Spouses, and where the Shareholder shall not have produced evidence reasonably satisfactory to the other parties within twenty (20) Business Days after such application or proceeding is brought, that the financial claims of such Spouse or former Spouse can and will be settled without in any way, directly or indirectly, affecting, encumbering, or interfering with the holding or voting of shares by the Shareholder;

(vi) has his or her employment or engagement as an independent contractor with the Corporation terminated by the Corporation for Cause; or

(vii) resigns from, or otherwise voluntarily leaves, his or her employment with the Corporation or has his or her employment with the Corporation terminated by the Corporation without Cause;

(the events listed in Sections 6.1(a)(i) through 6.1(a)(vii) inclusively are referred to as "**Triggering Events**");

then the Shares of such Defaulting Shareholder and any Affiliate of such Defaulting Shareholder (collectively, the "**Subject Trigger Shares**") shall be subject to purchase and/or redemption by the Corporation and/or the Special Shareholders other than the Defaulting Shareholder and any Affiliate of the Defaulting Shareholder (collectively, the "**Other Special Shareholders**") pursuant to the options and other terms, conditions, and procedures hereinafter set forth in this Article 6 *(A)* in the case of the occurrence of any of the Triggering Events listed in Subsections 6.1(a)(i), 6.1(a)(ii), 6.1(a)(iv), and/or 6.1(a)(vi), at a purchase price equal to *the lesser of* the Cost Amount or the Fair Market Value as of the date of the Triggering Event, as the case may be, of the Shares to be purchased, *or (B)* in the case of the occurrence of any of the Triggering Events listed in Subsections 6.1(a)(iii), 6.1(a)(v) and/or 6.1(a)(vii), at a purchase price equal to the Fair Market Value as of the date of the Triggering Event of the Shares to be purchased (as applicable, the "**Trigger Shares Purchase Price**").

(b) At any time within the period commencing on the date of occurrence of a Triggering Event and ending 180 calendar days following the date on which the Corporation and the Other Special Shareholders all receive notice from the Defaulting Shareholder or any other Person, or otherwise all become aware of the occurrence of such Triggering Event (the "**Special Shareholder Trigger Option Exercise Period**"), each of the Other Special Shareholders

6

shall have the first option and right (collectively, the "**Special Shareholder Trigger Options**" and each individually a "**Special Shareholder Trigger Option**"), but not the obligation, to purchase all or any part of the Subject Trigger Shares of such Defaulting Shareholder and/or any Affiliate of such Defaulting Shareholder, at the applicable Trigger Shares Purchase Price. Each Other Special Shareholder may exercise such Other Special Shareholder's Special Shareholder Trigger Option by giving written notice during the Special Shareholder Trigger Option Exercise Period to the Defaulting Shareholder and/or the Defaulting Shareholder's Affiliate(s), as applicable, to the Corporation, and to each of the other Other Special Shareholders, *(i)* stating that such Other Special Shareholder is thereby exercising its Special Shareholder Trigger Option to purchase some or all of the Subject Trigger Shares, *and (ii)* specifying the number of Subject Trigger Shares such Other Special Shareholder is so electing to purchase (subject, however, to the allocation provisions and other procedures, terms, and conditions set forth herein. In the event that more than one Other Special Shareholder timely and validly exercises a Special Shareholder Trigger Option (collectively, the "**Exercising Special Shareholders**"), then each of the Exercising Special Shareholders shall have the right to purchase such number of Subject Trigger Shares pursuant to the exercise of their Special Shareholder Trigger Options as may be agreed upon in a written instrument executed by all of the Exercising Special Shareholders and delivered to the Defaulting Shareholder and to the President and Secretary of the Corporation. If the Exercising Special Shareholders fail or neglect to unanimously agree to and execute an agreement in such regard within 5 calendar days after any Exercising Special Shareholder sends a written notice demanding that such an agreement be executed, then each of the Exercising Special Shareholders shall be conclusively deemed to have exercised such Exercising Special Shareholder's Special Shareholder Trigger Option to purchase such Exercising Special Shareholder's Trigger Prorata Percentage of the total number of Subject Trigger Shares, unless any two or more, or all, of the Exercising Special Shareholders, as the case may be, subsequently otherwise agree, in a written instrument executed by and delivered to the Defaulting Shareholder and to the President and Secretary of the Corporation, to a different allocation of such Subject Trigger Shares among them for purchase pursuant to the exercise of their Special Shareholder Trigger Options.

(c)   For purposes of this Article 6, the "**Trigger Prorata Percentage**" of each Exercising Special Shareholder in respect of the Subject Trigger Shares shall mean that percentage which the number of

7

        Special Voting Shares then held by such Exercising Special Shareholder Optionholder bears to the total number of Special Voting Shares then held by all of the Exercising Special Shareholders in the aggregate.

  (d)  If the Other Special Shareholders fail or neglect to timely and validly exercise their Special Shareholder Trigger Options to purchase all of the Subject Trigger Shares of such Defaulting Shareholder and/or any Affiliate of such Defaulting Shareholder, then the Corporation shall have the second option and right (the "**Corporation's Trigger Option**"), but not the obligation, to redeem and purchase, at the applicable Trigger Shares Purchase Price, all or any part of the Subject Trigger Shares which were not purchased by the Other Special Shareholders. The Corporation may exercise the Corporation's Trigger Option by giving written notice within a period of 30 calendar days following the expiration of the Special Shareholder Trigger Option Exercise Period (the "**Corporation's Trigger Option Exercise Period**") to the Defaulting Shareholder and/or the Defaulting Shareholder's Affiliate(s), as applicable, *(i)* stating that the Corporation is thereby exercising the Corporation's Trigger Option to purchase some or all of the Subject Trigger Shares then available for purchase, *and (ii)* specifying the number of such Subject Trigger Shares the Corporation is so electing to purchase.

  (e)  The closing of each purchase and sale of the Subject Trigger Shares, and the payment of the purchase price for such Subject Trigger Shares, pursuant to exercise of the Special Shareholder Trigger Options shall take place in accordance with, and subject to, the terms, conditions, procedures, and other provisions set forth in this Article 6 and Section 5.8 of this Agreement, as applicable.

6.2    [INTENTIONALLY OMITTED]"

20. On June 21, 2023, ECP's corporate counsel sent a letter (the "June 21, 2023 letter") to inform Poley that his purported sale of BmG's shares in ECP to Mr. Peterson, which was never effectuated, was not done in accordance with the terms of the Shareholders' Agreement, as amended, and thus constituted an "unauthorized transfer," and a Triggering Event.[5]

21. In the June 21, 2023 letter, ECP also informed Poley of its intent to redeem BmG's shares based on the purported unauthorized transfer of BmG's shares in ECP to Mr. Peterson.[6]

22. In a footnote in the June 21, 2023, ECP acknowledged that Poley's resignation from ECP in May 2023 was a Triggering Event.[7]

23. Section 6.1(a) of the Amended Shareholders' Agreement provides that when an employee's resignation from ECP is a Triggering Event, any purchase of the resigning employees shares in ECP must be in an amount "equal to the Fair Market Value as of the date of the Triggering Event." Section 6.1(a) of the Amended Shareholders' Agreement refers to this mandatory buyback price as the "Trigger Shares Purchase Price."

24. Based on its characterization of the "unauthorized transfer" as a "Triggering Event," ECP informed Poley of its intent to redeem BmG's shares at the what ECP characterized as "cost value" ($50,000), and not the "fair market value" (a

---

[5] *See* Exhibit 4.
[6] *See* Exhibit 4.
[7] *See* Exhibit 4.

9

value of at least $350,000 as later discussed herein) as provided in the flush language of Section 6.1(a) of the Shareholders' Agreement, as amended.

25. On October 6, 2023, ECP, through its authorized corporate counsel, sent an email to counsel for Poley (the "October 6, 2023 email) that included the following excerpt, wherein ECP requested a signed "certification" from Mr. Peterson confirming that he did not complete the purchase of BmG's shares in ECP, as shown in this verbatim excerpt from that letter:

> EyeCarePro purchased and redeemed for $50,000 all of the shares of EyeCarePro owned by BidmyGlasses pursuant to EyeCarePro's exercise of an option to do so under that certain Shareholders' Agreement described in the Redemption Notice. Such option was triggered by reason of the transfer by Steve and his family of all of their equity interests in BidmyGlasses to a person named Randall Peterson, which transfer was, under the Shareholders' Agreement, conclusively deemed to constitute an improper transfer of the EyeCarePro shares. In accordance with the procedures set forth in the Shareholders' Agreement, the $50,000 purchase price for the redeemed EyeCarePro shares is currently being held in escrow for BidmyGlasses pending receipt of a proper claim by BidmyGlasses for such funds. However, contrary to prior notices given to EyeCarePro by Steve, Steve recently advised EyeCarePro that the sale of BidmyGlasses to Mr. Peterson did not, in fact, take place and asked that the escrowed funds be released to him. Because the true owner of BidmyGlasses is now in question, we have requested that Steve obtain and provide a certification from Mr. Peterson that Steve is authorized to act on behalf of BidmyGlasses. [8]

26. On October 16, 2023, ECP, through its authorized corporate counsel, sent a document entitled "Certificate of Randall Peterson" (the "Certificate"). The Certificate was a document ECP (or its counsel) drafted, which ECP then asked Poley to provide to Mr. Peterson so that Mr. Peterson could sign the Certificate and thereby

---

[8] *See* Exhibit 5.

10

confirm and memorialize that BmG did not complete the sale of its stock to Randall Peterson.

27. Paragraph 2 of the Certificate reads as follows:

> **2.** Although a mutual nonbinding understanding in principle was previously reached between me and **Steven C. Poley ("Mr. Poley")**, a resident of Houston, Texas, under which it was contemplated that I would purchase all of the issued and outstanding stock of **BidmyGlasses, Inc. ("BidmyGlasses")**, a Texas corporation (the **"Contemplated Transaction"**), no binding documents as to such Contemplated Transaction were ever finalized and the Contemplated Transaction was not consummated.

28. As requested by ECP, Poley obtained Mr. Peterson's signature on the Certificate, and on October 20, 2023, Poley, through his counsel, provided ECP with a copy of the signed Certificate, in the exact form drafted by ECP.[9]

29. As of October 20, 2023, ECP had actual knowledge that BmG did not sell its shares in ECP to Randall Peterson.

30. On October 25, 2023, ECP, through its authorized corporate counsel, sent an email to Poley's counsel (the "October 25, 2023 email") to inform Poley that ECP's purchase of BmG's shares of ECP "must be reversed *ab initio*" because the "Triggering Event"—the sale to Randall Peterson—"did not occur."[10] The October 25, 2023 email also informed BmG and Poley that "BidmyGlasses will be reinstated as a shareholder of EyeCarePro as if the exercise of, and purchase of stock pursuant to, the option had never occurred."[11]

---

[9] *See* Exhibit 6.
[10] *See* Exhibit 7.
[11] *See* Exhibit 7.

31. In the October 25, 2023 email, ECP, through its authorized corporate counsel, informed BmG and Poley that ECP was "willing to voluntarily purchase and redeem" BmG's shares in ECP for $50,000.00.[12] BmG never accepted this offer.

32. As of October 25, 2023, BmG still owned 20% of the shares of ECP, and ECP knew this.

33. On April 22, 2024, ECP, through its authorized corporate counsel, emailed a letter to Poley (the "April 22, 2024 letter") that was entitled, "Notice of Exercise of Option to Purchase all Shares of EyeCarePro Inc. Owned by BidmyGlasses, Inc." [13] In the "April 22, 2024 letter", ECP contended that Poley had "intentionally and fraudulently misled" ECP into believing that BmG had sold its shares of ECP to Randall Peterson.[14]

34. The April 22, 2024 letter further contended that ECP was "exercising its option to purchase and redeem all of the Subject EyeCarePro Shares from BidmyGlasses."[15]

35. ECP read the April 22, 2024 letter before it was sent to Poley and authorized its corporate counsel to send the April 22, 2024 letter to Poley.

36. At the time ECP authorized its corporate counsel to send the April 22, 2024 letter, ECP Founder and CEO Daniel Rostenne ("Mr. Rostenne") had read and

---

[12] *See* Exhibit 7.
[13] *See* Exhibit 8.
[14] *See* Exhibit 8.
[15] *See* Exhibit 8.

12

understood the Shareholders' Agreement and all amendments thereto and approved of ECP counsel sending it to BmG and Poley, through Poley's counsel.

37. In the April 22, 2024 letter, ECP stated that unless some other mutual agreement was reached within five (5) calendar days thereafter, a "purchase and sale" of BmG's shares would take place at 10:00 am EST on May 3, 2024 at the Kentucky office of ECP's corporate counsel. The April 22, 2024 letter referred to this "purchase and sale" as the "option closing." Poley never consented to this purported transaction.

38. The April 22, 2024 letter contained the following excerpt:

> In any event, under the Shareholders Agreement and/or applicable law, EyeCarePro is allowed to offset any amounts owed to EyeCarePro by Poley and/or BidmyGlasses for damages pursuant to the Action or otherwise against any amounts EyeCarePro may owe Poley and/or BidmyGlasses.
>
> The damages owed to EyeCarePro by Poley and/or BidmyGlasses pursuant to the Action are substantially in excess of $350,000.00, which is the Fair Market Value of the Subject EyeCarePro Shares.
>
> Accordingly, the net purchase price payable to BidmyGlasses by EyeCarePro in respect of the purchase and redemption of the Subject EyeCarePro Shares, after offsetting a portion of the damages due to EyeCarePro pursuant to the Action equal to the Fair Market Value of the Subject EyeCarePro Shares, is **zero**.

39. As of April 22, 2024, ECP had not timely exercised its right to redeem BmG's shares in accordance with the terms of the Shareholders' Agreement.

40. As of April 22, 2024, nothing in the Shareholders' Agreement, as amended, authorized ECP to unilaterally (i.e., without consent from Poley) redeem BmG's shares in ECP, or to proceed with the "option closing" described in the above-referenced excerpt.

41. As of April 22, 2024, nothing in the Shareholders' Agreement, as amended, authorized ECP to redeem BmG's shares in ECP for a value of ECP's choosing or to then refuse to pay such value to Poley after taking BmG's shares.

13

42. As of April 22, 2024, nothing in the Shareholders' Agreement, as amended, authorized ECP to force BmG or Poley to sell BmG's shares in ECP to ECP on or after April 22, 2024 without Poley's consent to such a transaction.

43. On May 3, 2024, ECP seized control of BmG's shares in ECP for a net price of $0, a price that ECP determined was appropriate based on ECP's decision to "offset" amounts ECP claims Poley and/or BmG owe ECP for alleged "damages."

44. Nothing in the Shareholders' Agreement, as amended, authorized ECP to seize control of BmG's shares in ECP for a net purchase price of $0.

45. At the time ECP paid BmG a net price of $0 for BmG's shares in ECP, ECP assigned a $500,000 value to BmGs's shares.

46. After valuing BmG's shares in ECP at $500,000 in April 2024, ECP contends that it then "discounted" the value of the shares to $350,000 because the shares represent "a minority interest" and, according to ECP, are plagued by "a lack of marketability."

47. Poley contests the value ECP assigned to BmG's former shares and the legitimacy of the manner in which ECP unilaterally determined that value.

48. As of April 22, 2024, nothing in the Shareholders' Agreement, as amended, gave ECP the authority or discretion to discount the value of BmG's shares in ECP in the manner that ECP did.

49. Nothing in the Shareholders' Agreement, as amended, gave ECP the authority or discretion to "offset any amounts owed by EyeCarePro by Poley and/or BidmyGlasses for damages" that ECP solely determined.

14

50. BmG did not consent to sell ECP its shares in ECP on April 22, 2024 or at any time thereafter.

51. As of today, ECP maintains that BmG owns zero shares in ECP.

52. As of today, ECP has taken custody, possession, and control of all of BmG's shares in ECP.

53. BmG assigned Poley the right to assert causes of action against ECP to recover from ECP the value of the shares at issue, and BmG has authorized Poley to assert all counterclaims asserted herein.

**FIRST CAUSE OF ACTION: BREACH OF CONTRACT**

54. Poley reasserts and incorporates by reference each of the above numbered paragraphs.

55. Neither the Shareholders' Agreement, as amended, nor any other contract between ECP and BmG authorized ECP to unilaterally redeem BmG's shares in ECP on or after April 22, 2024, yet ECP did this anyway.

56. Neither the Shareholders' Agreement nor any other contract between ECP and BmG authorized ECP to unilaterally determine that it could redeem BmG's shares in ECP on or after April 22, 2024 without paying BmG the fair market value of those shares, yet ECP did this anyway.

57. Neither the Shareholders' Agreement nor any other contract between ECP and BmG authorized ECP to redeem BmG's shares in ECP on or after April 22, 2024 without paying any value for those shares, yet ECP did this anyway.

58. Neither the Shareholders' Agreement nor any other contract between ECP and BmG authorized ECP to unilaterally determine that ECP suffered "damages" based on Poley's acts or omissions and thereby "offset" the purported "purchase price" of BmG's shares in ECP by the amount of such "damages," yet ECP did this anyway.

59. ECP's acts and omissions, as summarized herein, were in material breach of the Shareholders' Agreement, as amended, and deprived BmG of the benefit of the bargain (i.e., its shares of ECP, the value of those shares, and the other rights afforded by the Shareholders' Agreement, as amended, including BmG's ability to determine when, whether, and at what price to sell the shares), and BmG has suffered other financial harm for which Poley, as an authorized assignee of BmG, seeks damages.

### SECOND CAUSE OF ACTION: CONVERSION

60. Poley reasserts and incorporates by reference each of the above numbered paragraphs.

61. BmG has not consented to the sale of any of its shares in ECP to ECP.

62. At all relevant times, BmG had a possessory interest in its shares in ECP.

63. Based on the Shareholders' Agreement, as amended, and the applicable law, BmG maintains that it should still own 20% of the shares of ECP. In the alternative, Poley is entitled to a judgment requiring ECP to pay Poley, as assignee of BmG, the fair market value of the shares, a value which is yet to be determined.

64. ECP unilaterally redeemed BmG's shares in ECP without consent from BmG or Poley.

65. ECP has refused to return BmG's shares and has taken BmG's shares without paying BmG fair market value for the shares, despite BmG's demand for payment.

66. Through its course of wrongful, unlawful acts and omissions, as described herein, ECP has unreasonably, intentionally, and maliciously withheld possession or the right of possession and thereby wrongfully deprived BmG of access to and ownership of its shares in ECP in a manner that is inconsistent with BmG's property rights. ECP has done this by intentionally dispossessing BmG of its lawful possession of BmG's shares in ECP, purportedly taking possession of the shares through an unlawful and unauthorized sale/redemption, and refusing to surrender the shares to BmG despite a lawful demand from BmG.

67. ECP's course of conduct, as described herein, amounts to a conversion of BmG's shares, which ECP purloined from BmG without contractual or legal authority.

68. ECP's acts and omissions, as described herein, have caused BmG financial and other legally cognizable harm for which Poley, as an authorized assignee, seeks damages.

### THIRD CAUSE OF ACTION: UNJUST ENRICHMENT

69. Poley reasserts and incorporates by reference each of the above numbered paragraphs.

70. This cause of action is asserted only in the alternative to the aforementioned breach of contract claim.

71. As set forth herein, ECP has been unjustly enriched through a course of conduct that has resulted in ECP unjustly and unlawfully possessing BmG's shares in ECP without paying BmG fair market value for its shares.

72. There was no juristic reason, provided by contract or other valid common law, equitable, or statutory obligation, for ECP to possess BmG's shares or to reap the benefits of such possession.

73. Accordingly, BmG has suffered financial and other legally cognizable harm for which Poley, as an authorized assignee, seeks damages.

### FOURTH CAUSE OF ACTION: FOR MONEY HAD AND RECEIVED

74. Poley reasserts and incorporates by reference each of the above numbered paragraphs.

75. Pursuant to the Shareholders' Agreement, as amended, ECP was required to appropriately safeguard, account for, and distribute money belonging to BmG in accordance with the Shareholders' Agreement, as amended.

76. Instead, as set forth herein, ECP unilaterally redeemed BmG's shares in ECP and has since retained possession of proceeds of that rightfully belongs to BmG.

77. Accordingly, BmG is entitled to its fair share of all money that is held by ECP but should be held by BmG in equity and good conscience.

**PRAYER**

78. Defendant/Counter-plaintiff Steven Poley, as the authorized assignee of BmG, prays that Plaintiff/Counter-defendant ECP take nothing by its claims, which should be dismissed with prejudice. Poley further seeks judgment in his favor on each counterclaim asserted herein and seeks the following damages arising from such causes of action:

   a. Actual, direct, consequential, and out-of-pocket damages resulting from ECP's breach of the Shareholders' Agreement, as amended;

   b. Benefit of the bargain damages arising from ECP's breach of the Shareholders' Agreement, as amended;

   c. Special damages and punitive/exemplary damages;

   d. Emotional distress damages;

   e. Pre-judgment and post-judgment interest at the maximum rates authorized by law;

   f. An award of attorney's fees and taxable costs of court in an amount approved by this Court; and

   g. All other legal and equitable relief to which Poley is justly entitled.

Respectfully submitted,

**MINCES RANKIN PLLC**

By:    */s/ David M. Minces*
   **David M. Minces**
   Attorney-in-Charge
   Federal I.D. No.: 435389
   State Bar No.: 24026880
   Email: david@mincesrankin.com
   4545 Bissonnet Street, Suite 286
   Bellaire, Texas 77401
   Telephone: (346) 701-8563
   Facsimile:  (713) 583-9795

**ATTORNEY FOR DEFENDANT/ COUNTER-PLAINTIFF STEVEN C. POLEY**

### CERTIFICATE OF SERVICE

I hereby certify that on August 2, 2024, the foregoing was filed and served on all counsel of record via electronic mail through the Court's ECF system.

Brett Holubeck (bholubeck@fisherphillips.com)
Fisher & Phillips LLP
910 Louisiana Street, Suite 4000
Houston, TX 77002
Telephone: (713) 292-0150

Craig D. Mills (craig.mills@bipc.com)
Buchanan Ingersoll & Rooney, PC
Two Liberty Place
50 South 16th Street, Suite 3200
Philadelphia, PA 19102
Telephone: (215) 665-3863

                                           */s/ David M. Minces*
                                             David M. Minces