## UNITED STATES DISTRICT COURT FOR
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **EYECAREPRO, INC.,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | **CIVIL ACTION NO. 4:23-cv-2287** |
| | § | |
| **STEVEN C. POLEY and** | § | |
| **BIDMYGLASSES, INC.** | § | |
| | § | |
| *Defendants.* | § | |

## PLAINITFF EYECAREPRO, INC.'S BRIEF IN OPPOSITION TO DEFENDANT/COUNTER-PLAINTIFF STEVEN POLEY'S MOTION FOR <u>PARTIAL SUMMARY JUDGMENT ON COUNTERCLAIMS</u>

Respectfully submitted,

**FISHER & PHILLIPS, LLP**

/s/ *Brett Holubeck*
**BRETT HOLUBECK, ESQ.**
Texas Bar No. 24090891
S.D. No. 3392373
910 Louisiana Street, Suite 4000
Houston, Texas 77002
Telephone: (713) 292-0150
Fax: (713) 292-0151
bholubeck@fisherphillips.com

**BUCHANAN INGERSOLL & ROONEY PC**

/s/ *Craig Mills*
**CRAIG D. MILLS, ESQ**. (*Pro Hac Vice*)
PA Bar No. 81331
**JAYME C. BRONSON, ESQ**. (*Pro Hac Vice*)
PA Bar No. 325481
Two Liberty Place
50 South 16th Street, Suite 3200
Philadelphia, PA 19102
Telephone: (215) 665-3863
craig.mills@bipc.com
jayme.bronson@bipc.com

*Attorneys for Plaintiff/Counterclaim Defendant EyeCarePro, Inc.*

## **TABLE OF CONTENTS**

I.  NATURE AND STAGE OF PROCEEDINGS ................................................................. 1

II. STATEMENT OF FACTS NECESSARY TO RESOLUTION OF MOTION ........... 2

    **A.** Poley Becomes a Director and Employee of ECP and Executes the
    Shareholders Agreement and CPIA. ...................................................................... 2

    **B.** Poley Resigns Before ECP Can Discover His Covert and Unlawful
    Scheme to Develop "Ring IQ" Using ECP Employees and Steals ECP's
    Largest Customer. ................................................................................................. 4

III. STATEMENT OF ISSUES REQUIRING RESOLUTION ......................................... 8

IV. STATEMENT OF AUTHORITY AND STANDARD OF REVIEW ......................... 8

    **A.** Summary Judgment Standard ............................................................................. 8

    **B.** Counter-Statements of Applicable Law ............................................................. 9

        1.  Breach of Contract Law in Ontario: .......................................................... 9

        2.  Breach of Contract Law in Texas: ........................................................... 10

        3.  Conversion Law in Ontario: .................................................................... 11

        4.  Conversion Law in Texas: ....................................................................... 11

V.  LEGAL ARGUMENT ............................................................................................. 12

    **A.** Questions of Material Fact Exist as to Whether Poley's Admitted Prior
    Material Breaches of the Shareholders' Agreement Bar His Right to
    Recover Damages for ECP's Alleged Subsequent Breach. .............................. 12

    **B.** Questions of Material Fact Exist as to the Date of Poley's Triggering
    Event for Purposes of ECP's Redemption of Shares Under the
    Shareholders' Agreement .................................................................................. 13

    **C.** Questions of Material Fact Exist as to the Trigger Shares Purchase Price
    Paid for Poley's Shares. .................................................................................... 14

    **D.** Questions of Material Fact Exist as to Whether ECP's Redemption of
    Corporate Shares Constitutes a Conversion ..................................................... 16

    **E.** Granting Poley's Motion Would Defy Public Policy Considerations and
    Result in an Inequitable, Unjust, and Unconscionable Outcome. .................... 16

VI. CONCLUSION ....................................................................................................... 19

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*3 Gill Homes, Inc. v. 5009796 Ontario, Inc.*, 2024 ONCA 6, 2024
CarswellOnt 29 .................................................................................................. 17

*373409 Alberta Ltd. v. Bank of Montreal*,
2002 SC 81 ................................................................................................. 11, 16

*Allied Electrical & Power, Inc. v. Airport Prod. Installers*,
2008 WL 4561564 (N.D. Tex. Oct. 10, 2008) ................................................. 9

*Alvi v. Misir*,
2004 O.J. No. 5088, 50 B.L.R. (3d) 175 ........................................................ 18

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .......................................................................................... 8

*Barbier v. Barry*,
345 S.W.2d 557 (Tex. App. – Dallas 1961, no writ) ..................................... 10

*Bensono v. Indymac Mortg. Servs.*,
2014 WL 787751 (Tex. App. Feb. 27, 2014) ................................................. 10

*Bhasin v. Hrynew*, 2014 SCC 71, [2014] 3 S.C.R. 494 ....................................... 16

*In re Brick*,
351 S.W.3d 601 (Tex. App. 2011) .................................................................. 18

*C.M. Callow, Inc. v. Zollinger*,
2020 SCC 45, 2020 CarswellOnt 18468 ........................................................ 17

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .......................................................................................... 8

*Conlee Seed Co. v. Branvik*,
526 S.W.2d 795 (Tex. App.-Amarillo 1975, no writ) .................................... 12

*DiGiuseppe v. Lawler*,
269 S.W.3d 588 (Tex. 2008) ........................................................................... 18

*Fasteners & Fitters v. Wang*,
2020 ONSC 1649, [2020] OJ No. 1381 (QL) ................................................. 9

*In re G.D.H.*,
    366 S.W.3d 766 (Tex. App. – Amarillo 2012, no. pet.) ............................................... 10

*James Constr. Grp., LLC v. Westlake Chem. Corp.*,
    650 S.W.3d 392 (Tex. 2022), reh'g denied...................................................... 11, 12, 17

*Kew v. Kornarski*,
    2020 ONSC 4677 ...................................................................................................... 11

*Lawyers Title Co. v. J.G. Cooper Dev., Inc.*,
    424 S.W.3d 713 (Tex. App.-Dallas 2014, pet. denied).......................................... 11, 16

*Mahavier v. PNC Bank, N.A.*,
    2014 WL 12489602 (W.D. Tex. July 11, 2024) ........................................................ 10

*Martinez v. Lloyds*,
    2015 WL 7571840 (S.D. Tex. Nov. 24, 2015) ...................................................... 10, 12

*Narvaez v. Wilshire Credit Corp.*,
    757 F. Supp. 2d 621 (N.D. Tex. 2010) ...................................................................... 10

*Nutrasep, LLC v. TOPC Tex., LLC*,
    No. A-05-CA-523, 2006 WL 3063432 (W.D. Tex. Oct. 27, 2006)............................... 8

*Pentad Construction Inc. v. 2022988 Ontario Inc.*,
    2021 ONSC 824, 24 C.L.R. (5th) 164 ....................................................................... 10

*Plas-Tex Canada Ltd. v. Dow Chemical of Canada Ltd.*,
    2004 ABCA 309, 245 D.L.R. (4th) 650 (Alta. C.A.) ................................................. 17

*R.L. Inv. Prop., LLC v. Hamm*,
    715 F.3d 145 (5th Cir. 2013) ...................................................................................... 9

*Ratz-Cheung v. BMO Nesbitt Burns Inc.*,
    2024 ONSC 1161 ...................................................................................................... 15

*Tercon Contractors Ltd. v. British Columbia (Minister of Transportation
    and Highways)*, 2010 SCC 4, [2010] 1 S.C.R. 69 ...................................................... 17

*Texas Utilities Electric Co. v. Aetna Casualty & Surety Co.*,
    786 S.W.2d 792 (Tex. App. – Dallas 1990, writ denied) ........................................... 11

*Trico Technologies Corp. v. Montiel*,
    949 S.W.2d 308 (Tex. 1997)...................................................................................... 15

**Other Authorities**

Fed. R. Civ. P. 56(c) ............................................................................................. 8

## I.    NATURE AND STAGE OF PROCEEDINGS

Defendant/Counterclaim Plaintiff Steve Poley ("Poley") is a former employee and Director of ECP who, while serving in his roles as both employee and Director, and while holding a 20% share of ECP's stock, used ECP's confidential and proprietary information to secretly develop a competing software which he then used to lure away ECP's largest client for his own personal gain.  In aid of this unlawful project, Poley enlisted the help of ECP's own developers, swayed them from their own duties of loyalty to ECP, and offered them positions as founders in his competing business venture.

Once ECP uncovered clear and incontrovertible proof of this improper conduct, it was faced with the intolerable predicament of having a 20% shareholder, entitled to access all of the information about the company's operations, finances, and business plans, who was actively competing with ECP.  To remedy this situation and avoid further harm, ECP justifiably redeemed the ECP shares held by Poley's competing venture to protect its business interests.

Poley has apparently decided that his best defense to the ironclad claims against him is to go on offense, throwing stones at ECP for alleged procedural defects in the method by which it redeemed his 20% interest, and now seeks a ruling as a matter of law that the redemption was unlawful.  However, Poley cannot carry the burden inherent in obtaining summary judgment, as multiple issues of fact, including those regarding his own prior material breach of the contracts at issue, bar this relief.  Moreover, granting Poley's Motion would inequitably punish ECP for justifiably redeeming company shares from a shareholder that knowingly and intentionally misused the company's resources, stole its

employees and proprietary information, and diverted business from its largest customer, all for his own personal benefit. ECP respectfully submits that the Court should not reward Poley for successfully concealing his disloyal plan until after he resigned from the company by granting summary judgment in his favor. Poley's motion should be denied.

The Court has issued an amended scheduling and docket control order on July 15, 2024 that includes the following deadlines:

- Discovery cutoff: December 11, 2024

- Motions: February 11, 2025

- Mediation or settlement conference: March 25, 2025

- Filing of joint pretrial order and motions in limine: April 24, 2025

- Docket call: June 17, 2025

Poley's Motion was filed on October 17, 2024. Pursuant to this Court's rules, the parties are required to mediate within 45 days of that filing date. ECP's own Motion for Partial Summary judgment, which more fully outlines Poley's covert project and his corresponding breach of contract, breach of fiduciary duty, and breach of duty of loyalty owed to ECP, will be filed in advance of the Court-mandated mediation.

## II.    STATEMENT OF FACTS NECESSARY TO RESOLUTION OF MOTION

### A. Poley Becomes a Director and Employee of ECP and Executes the Shareholders Agreement and CPIA.

On March 14, 2017, ECP acquired BidmyGlasses, Inc. ("BmG"), a corporation owned and controlled by Poley. *See* Motion, pp. 3-4. As part of that transaction, Poley

received a 20% share of the stock of ECP, which shares he held through BmG.  Poley also became an employee and a Director of ECP.  *Id.*

BmG and ECP signed an Amended and Restated Shareholders' Agreement (the "Shareholders' Agreement") dated March 17, 2017, which set forth applicable "Triggering Events" for a shareholder to be deemed a "Defaulting Shareholder" and the subsequent rights of the Corporation to purchase all or part of the Defaulting Shareholder's shares in ECP.  *See* Motion, Exh. 3 § 6.1(a)-(b), pp. 13-14.  The Shareholders' Agreement set a 180-day period for Other Shareholders to exercise their right to purchase a Defaulting Shareholder's shares after a Triggering Event, followed by another 180-day period for ECP to do the same: a total of 360 days (hereinafter, the "Trigger Period").  The Shareholders' Agreement was later amended on May 16, 2023—approximately two weeks after Poley tendered his resignation to ECP and several months after Poley began breaching his contractual and fiduciary obligations to ECP.

The Shareholders' Agreement includes both a confidentiality provision and non-competition and non-solicitation provisions.  *See id.*, § 7, pp. 15-18.  The confidentiality provision provides that Poley/BmG are prohibited from directly or indirectly making use of confidential knowledge or information "relating to or concerning the customers, products, technology, trade secrets, systems or operations" regarding the property, business and affairs of ECP.  *See id.*, § 7.1(a), pp. 15-16.  The Agreement further provides that for as long as Poley/BmG remain shareholders of ECP, and for three years thereafter, they may not "induce or attempt to induce or directly or indirectly to participate in the inducement of either, any employee of the Corporation to breach that employee's contract of

3

employment" with ECP, or to "directly or indirectly solicit, invite, encourage or request any Existing Client of the Corporation to transfer its business or any account from the Corporation to [the] Shareholder or to any third party…" *See id*., §§ 7.2(a)-(b), pp. 16-17.

In his role as employee of ECP, Poley signed a Confidentiality and Proprietary Information Agreement ("CPIA"), which provides additional protections for ECP's Confidential Information and Proprietary Information that Poley was undisputedly given access to, including information concerning ECP's customers, services, pricing, profitability, business plans and policies, as well as the talents and abilities of its various employees. *See* attached as **Exhibit A**, a true and accurate copy of the CPIA, at ¶¶ 1, 3, 4.

**B. Poley Resigns Before ECP Can Discover His Covert and Unlawful Scheme to Develop "Ring IQ" Using ECP Employees and Steals ECP's Largest Customer.**

On May 4, 2023, Poley submitted his notice of resignation from ECP. *See* Motion at p. 4. Poley's resignation came after months of disagreement between Poley and ECP's founder and CEO, Daniel Rostenne ("Rostenne"), over ECP's software program named "Ring Analytics." Poley wanted to replace Ring Analytics with a new software utilizing ChatGPT-style artificial intelligence, which Poley dubbed "Ring IQ," but Rostenne was uncertain about the idea. Poley remained adamant in his desire to develop Ring IQ with or without the approval from Rostenne or ECP, which eventually prompted his resignation.

Unbeknownst to ECP or Rostenne, for months leading up to his resignation Poley had already been secretly working to develop his Ring IQ software. In early 2023, Poley enlisted the help of ECP's own staff to bring Poley's vision to life and create Ring IQ. In doing so, Poley solicited and encouraged ECP's employees to violate their own duties of

loyalty for his own personal benefit and encouraged ECP's own staff to develop *his*

competing software without ECP's involvement before offering them positions as founders

of the new company.  An early email from Poley describing his intent to proceed with Ring

IQ "with or without" ECP reads as follows:

On Wed, Jan 25, 2023 at 3:57 PM Steve Poley <steve.poley@eyecarepro.net> wrote:

**Regarding the Ai project ... YES START NOW!**  Help us make a "beautiful" work of
art.  Something stunning for all of USA healthcare.  I am personally guaranteeing the effort
with your satisfaction guarantee offer.  While I am the largest single shareholder of
EyeCarePro, the collective Rostenne Family has controlling interest.  I will make your
work be significant with or without EyeCarePro.  My full intention is "with" EyeCarePro
but you are correct there is some reservation inside the company.

*See* **Exhibit B**, email correspondence from Poley dated January 25, 2023

(EyeCarePro_00004060-4067).  Six weeks later, Poley told his disloyal development team

about his plans to take Ring IQ for himself and develop a new business venture:

On Sun, Mar 5, 2023 at 5:25 PM Steve Poley <scpoley@gmail.com> wrote:

I'm making big moves to separate the RING Ai business from EyeCarePro.

Daniel Rostenne, CEO, wants to be in the web hosting business selling "beautiful" web
designs and unique content, and low prices.  Big issue with a strategy that is high service and
low prices.

He is not interested in building out RING Ai. *He thinks it is a program in search of a
problem.*  So, the RING program isn't getting much more $$$ support for ChatGPT, LLM
programs, or Gen-Ai resources.

I am negotiating to separate the businesses so RING Ai can break out. SMB customer service
can be dramatically improved with GPT tools.   Just need to listen to some of the calls.  :-)

RING Ai needs to be its own Company with its own founders.

*See* **Exhibit C**, email correspondence dated March 5, 2023 (POLEY_000137-138); s*ee*

*also*, **Exhibit D**, email correspondence dated March 26, 2023 (POLEY_000149-151)

("Daniel Rostenne, CEO, has very limited interest in ChatGPT or RING Ai…be careful what you share with any Rostenne person.")

In addition to involving ECP staff in his clandestine project to develop Ring IQ, Poley conducted secret negotiations with ECP's largest customer, Texas State Optical ("TSO"), to obtain TSO's advance agreement to shift its business from ECP to Poley and his new venture. These talks began several months before Poley resigned from ECP, while he was still serving as a Board member, and involved hundreds of communications between Poley, his team, and John Marvin. For example, on April 30, 2023, Poley laid out his plan to take over the TSO accounts with his new venture to Marvin, while belittling Rostenne and ECP in the process:

> John…I'm splitting from EyeCarePro… I intend to continue supporting TSO with digital marketing, including websites, Google Business, social media help, and digital advertising *__if you will have me.__* I have the people to support TSO better than EyeCarePro can do with a seamless changeover. Daniel [Rostenne]'s business attitude is MVP but NOT for *__most valuable product__* but for the *__minimum viable product__* to get paid.

*See* attached as **Exhibit E**, email correspondence dated April 30, 2023 (POLEY_000240-242) (emphasis in original).

On or about June 1, 2023, Poley's plan came to fruition when TSO emailed an announcement to the members of its network, stating that it had decided to shift its website hosting and other related services to Poley's Ring IQ software:

> After careful consideration, TSO, Inc. decided to discontinue our relationship with EyecarePro and retain the services of RingIQ, a new company owned by Steve Poley. Steve and his team began working on transferring the local office website domains from the EyecarePro server to a new server managed by RingIQ.

*See* **Exhibit F**, a true and correct copy of TSO's email announcement.

Throughout the duration of this secret and unlawful scheme, all of which was designed to injure ECP's business and business reputation, Poley was a Director and employee of ECP and receiving compensation in return for his supposedly loyal services. Significantly, Poley **does not dispute** that he began offering Ring IQ to TSO while he was still an employee and Director of ECP. *See* **Exhibit G**, Poley's Admissions, at ¶ 15.

Any one of Poley's shockingly disloyal and unlawful activities were a breach of his duties under the Shareholders' Agreement, the CPIA, or both. Thus, these bad acts constituted multiple, independent Triggering Events under the Shareholders' Agreement, justifying Poley's immediate termination for Cause – if, that is, ECP had been aware of them. Unfortunately, it was not until litigation commenced and the Parties exchanged discovery that the full nature and extent of Poley's plan came to light. This knowledge presented ECP with an impossible dilemma: either redeem Poley's shares or allow a rogue Director who had waged a secret war on the very company he was bound to serve to continue to receive confidential information about ECP's business, and to benefit financially from what success ECP could still achieve despite his betrayal.

The choice was clear. On April 22, 2024, ECP sent Poley a letter entitled "Notice of Exercise of Option to Purchase all Shares of EyeCarePro, Inc. owned by BidmyGlasses, Inc." (the "Notice Letter"). *See* Motion, Exh. 5. The Notice Letter provided that, in accordance with applicable provisions of the Shareholders' Agreement dated March 17, 2017, ECP would purchase all ECP shares from BmG pursuant to Section 6.1(a)(vii) (resignation or termination "without cause") and reserved the right to assert at any time

that such exercise was pursuant to Section 6.1(a)(vi) (termination "for cause"). *See id*., p. 2. Shortly thereafter, ECP redeemed all from BmG/Poley for the Fair Market Value provided in the Shareholders' Agreement (the "Trigger Shares Purchase Price.")

## III.   STATEMENT OF ISSUES REQUIRING RESOLUTION

The issues to be resolved are determining if questions of material fact exists as to: (a) whether Poley's admitted prior material breaches of the Shareholders' Agreement bars his right to recover damages for ECP's alleged subsequent breach; (b) the date of Poley's Triggering Event for purposes of ECP's redemption of shares; (c) whether ECP's redemption of corporate shares constitutes a conversion; and (d) whether granting Poley's Motion would defy public policy considerations and result in an inequitable, unjust, and unconscionable outcome.

## IV.   STATEMENT OF AUTHORITY AND STANDARD OF REVIEW

### A. Summary Judgment Standard

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A party moving for summary judgment bears the initial burden of identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact that must be tried to the jury. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A non-moving party can defeat the motion by providing specific facts showing a genuine issue of material fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

When ruling on summary judgment, "the court is required to view all facts and inferences in the light most favorable to the nonmoving party and resolve all disputed facts in favor of the nonmoving party." *Allied Electrical & Power, Inc. v. Airport Prod. Installers*, 2008 WL 4561564, at *2 (N.D. Tex. Oct. 10, 2008) (denying summary judgment on counterclaims); *see also R.L. Inv. Prop., LLC v. Hamm*, 715 F.3d 145, 149 (5th Cir. 2013). As long as there appears to be some support for the disputed allegations such that "reasonable minds could differ as to the import of the evidence," a motion for summary judgment must be denied. *See Anderson*, 477 U.S. at 250-51; *see also Nutrasep, LLC v. TOPC Tex., LLC*, No. A-05-CA-523, 2006 WL 3063432 at *4 (W.D. Tex. Oct. 27, 2006) (denying summary judgment motion where genuine issues of material fact remained as to which party breached a contract first).

### B. Counter-Statements of Applicable Law

For purposes of this Opposition, and consistent with the choice-of-law analysis in Poley's Motion, ECP provides the standards of law for both Ontario and Texas herein.

#### 1. Breach of Contract Law in Ontario:

Under Ontario law, a breach of contract claim requires proof of the following: (1) the nature of the contract, (2) the parties to the contract, (3) privity of contract between plaintiff and defendant, (4) the relevant terms of the contract, (5) which term was breached, and (6) the damages caused by the breach. *Fasteners & Fitters v. Wang*, 2020 ONSC 1649, [2020] OJ No. 1381 (QL) at ¶ 91. While the terms of a contract generally dictate the contracting parties' conduct, Ontario courts also consider whether a breaching party's actions cab be overlooked due to the opposing party's failure to act fairly, honestly, and

impartially. *See*, *e.g.*, *Pentad Construction Inc. v. 2022988 Ontario Inc.*, 2021 ONSC 824, 24 C.L.R. (5th) 164 (a contract is "conclusive and binding upon the parties in the absence of fraud or bad faith, or unless the person entrusted with the duty of making it, has knowingly and willfully disregarded his duty.") (citations omitted).

### 2. Breach of Contract Law in Texas:

Under Texas law, "[t]he elements of a breach of contract claim are (1) the existence of a valid contract, (2) performance or tendered performance by the plaintiff, (3) breach of the contract by the defendant, and (4) resulting damagers to the plaintiff." *Bensono v. Indymac Mortg. Servs.*, 2014 WL 787751, at *1 (Tex. App. Feb. 27, 2014) (citations omitted). The party claiming breach must show that it fully performed its own duties under the contract at issue, or the will fail. *See, e.g. Martinez v. Lloyds*, 2015 WL 7571840 (S.D. Tex. Nov. 24, 2015) (granting summary judgment and dismissing breach of contract claim where plaintiffs did not perform as required by the contract); *Narvaez v. Wilshire Credit Corp.*, 757 F. Supp. 2d 621 (N.D. Tex. 2010) (same); *Mahavier v. PNC Bank, N.A.*, 2014 WL 12489602 (W.D. Tex. July 11, 2024) (same).

Texas courts of appeals have also broadly applied the "doctrine of substantial compliance" to excuse "exactitude in the performance of contractual duties…where any deviations or deficiencies do not seriously impair the purpose underlying the contractual provision." *In re G.D.H.*, 366 S.W.3d 766, 771 (Tex. App. – Amarillo 2012, no. pet.). The doctrine of substantial compliance has repeatedly been applied to contractual notice provisions. *See, e.g. Barbier v. Barry*, 345 S.W.2d 557, 562 (Tex. App. – Dallas 1961, no writ) (where "failure to send [notice] by registered mail did not destroy its effectiveness as

notice"); *Texas Utilities Electric Co. v. Aetna Casualty & Surety Co.*, 786 S.W.2d 792, 793 (Tex. App. – Dallas 1990, writ denied) (where sending notice to incorrect address did not destroy substantial compliance with notice requirements).   Indeed, "a party's minor deviations from a contractual notice condition that do not severely impair the purpose underlying that condition and cause no prejudice do not and should not deprive that party of the benefit of its bargain." *James Constr. Grp., LLC v. Westlake Chem. Corp.*, 650 S.W.3d 392, 406 (Tex. 2022), reh'g denied.

### 3.   Conversion Law in Ontario:

There are three essential elements which must be established to make out the tort of conversion: (1) the property forming the subject matter of a conversion claim must be specific personal property; (2) the plaintiff must have a possessory interest in the relevant chattel; and (3) the defendant must commit an intentional and wrongful act in respect of the chattel.   *See Kew v. Kornarski*, 2020 ONSC 4677, ¶ 22.   However, an authorized interference with corporate shares is not wrongful; therefore, it cannot amount to conversion.   *See 373409 Alberta Ltd. v. Bank of Montreal*, 2002 SC 81, at ¶ 8.

### 4.   Conversion Law in Texas:

Conversion is defined in Texas as the "unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another, to the exclusion of or inconsistent with the owner's rights." *Lawyers Title Co. v. J.G. Cooper Dev., Inc.*, 424 S.W.3d 713, 718 (Tex. App.-Dallas 2014, pet. denied) (citations omitted).   In order to establish a claim for conversion, a plaintiff must show: (1) the plaintiff owned, possessed or had the right to immediate possession of property; (2) the property was personal

property; (3) the defendant wrongfully exercised dominion or control over the property; and (4) the plaintiff suffered injury. *Id.* A wrongful taking for purposes of conversion only occurs when the property is taken without either the explicit or implicit consent of the owner. *See Conlee Seed Co. v. Branvik*, 526 S.W.2d 795, 798 (Tex. App.-Amarillo 1975, no writ) ("there can be no conversion by the taking of property where the owner has expressly or impliedly consented to the taking.")

## V.    <u>LEGAL ARGUMENT</u>

### A. Questions of Material Fact Exist as to Whether Poley's Admitted Prior Material Breaches of the Shareholders' Agreement Bar His Right to Recover Damages for ECP's Alleged Subsequent Breach.

Courts in both Ontario and Texas have recognized that a party may not successfully pursue a breach of contract claim where, as here, they have committed a prior material breach of that same agreement. *See, e.g., Martinez*, 2015 WL 7571840; *James Constr. Grp.*, 650 S.W.3d 392. The record here is clear that Poley is guilty of multiple prior material breaches of the Shareholders Agreement – in fact, he has expressly admitted as much. In the months leading up to his resignation, Poley secretly hatched and carried out a plan to develop a competing software "with or without" ECP's knowledge and support, ultimately deciding to "split" from ECP and take its largest customer with him. *See* Exhs. B, E. In aid of his project, Poley enlisted the help of ECP's own developers, swaying them from their duties of loyalty to ECP, and offered them positions as founders in his competing business venture. *See* Exhs. C, D. Poley's elaborate scheme played out over the course of months before he actually resigned from ECP, during which time he met with TSO's executive leadership and convinced them to cut all business relations with ECP. *See* Exh.

E.  The emails cited herein are but a small fraction of the mountain of evidence ECP has uncovered regarding Poley's hidden plot, which includes some 1,200 "Slack" messages between Poley and his design team over the course of three months.

Any one of these activities constitutes a breach of Poley's duties under the Shareholders' Agreement and Amended Shareholders' Agreement.  *See* Motion, Exh. 3, Art. 7, pp. 15-18 and Exh. 4, pp. 23-27.  Together, they form a tapestry of treachery that make a mockery of Poley's contractual assurances.  Having ripped his contractual obligations to shreds, Poley cannot now assert his claimed rights under those same Agreements.

Poley has already admitted many of these damning facts.  *See* Exh. G.  While the remainder are in dispute, even these disputes preclude a grant of summary judgment.  Thus, Poley's motion for summary judgment on his claim for breach of contract must fail.

**B.  Questions of Material Fact Exist as to the Date of Poley's Triggering Event for Purposes of ECP's Redemption of Shares Under the Shareholders' Agreement.**

It is undisputed that on May 4, 2023, Poley submitted his notice of resignation from ECP to Rostenne and ECP's Shareholders.  *See* Poley's Motion, p. 4.  Poley takes the position that this was a "Triggering Event" under the Shareholder's Agreement, thus starting the clock for ECP's other shareholders to exercise their redemption.  *See* Poley's Motion at § V.E. at p. 19 ("The shareholders' option period starts when the non-defaulting shareholders 'all received notice [ ] or otherwise all become aware' of a Triggering Event").  Under the terms of the Shareholders' Agreement in effect at that time— *i.e.,* the March 17, 2017 version—ECP had a Trigger Period of 360 days to notice its intent to redeem Poley's

13

shares.  It is undisputed that ECP gave Poley notice of its intent to redeem on April 22, 2024, within the allotted Trigger Period.

Poley contravenes his own statement and seeks to rely upon an Amendment to the Shareholders' Agreement—dated May 16, 2023—to suggest that ECP only had a Trigger Period of 210 days to redeem Poley's shares.  *See* Motion, pp. 19-20, Exh. 4.  However, that version of the Shareholders' Agreement was not in effect until *after* Poley tendered his resignation and well after Poley hatched his secret plan to develop a competing software and steal ECP's business for his own personal gain.  These bad acts *would have* constituted a Triggering Event under the Shareholders' Agreement and/or led to Poley's immediate for-cause termination if ECP knew about the events before Poley resigned.  At the very minimum, questions of fact remain as to exactly when the Trigger Period began and, as a result, which version of the Shareholders' Agreement applies.

## C. Questions of Material Fact Exist as to the Trigger Shares Purchase Price Paid for Poley's Shares.

Poley alleges a "second breach" of the Shareholders' Agreement based on the purported failure of ECP to pay BmG/Poley the fair value of the shares it redeemed.  In making this argument, Poley assumes the Triggering Event is the date of Poley's resignation and, pursuant to the Amended Shareholders' Agreement dated May 16, 2023 at subsection 6.1 (a)(vii), the purchase price is thereby "equal to the Fair Market Value as of the date of the Triggering Event of the Shares to be purchased."  *See* Motion, at pp. 20-21; Motion, Exh. 4, § 6.1(a).

Once again, Poley's Motion ignores that his own admitted misconduct resulted in multiple prior material breaches of his duties under the very contracts on which he attempts to rely, and gave ample grounds for his termination for cause.  While Poley was unfortunately successful in his efforts to conceal his work against ECP's interests, that does not legally or equitably bar ECP from designating Poley's departure from ECP as a "for cause" termination. *See Ratz-Cheung v. BMO Nesbitt Burns Inc.*, 2024 ONSC 1161 (where employer became aware for the first time during the litigation process that employee, prior to her dismissal, had copied thousands of e-mails containing sensitive information, the employer, having previously dismissed the employee without cause, amended the statement of defense to allege after-acquired cause); *Trico Technologies Corp. v. Montiel*, 949 S.W.2d 308 (Tex. 1997) (adopting the "after-acquired evidence doctrine" in Texas and recognizing, "[i]f an employer establishes that an employee's misconduct was so severe that the employee would have been legitimately discharged solely on that basis, after-acquired evidence of the employee's misconduct bars reinstatement and recovery for actual damages for the period after the employer discovered the grounds for termination.").

As a result, the purchase price for ECP's redemption of shares should correspond to subsection 6.1 (a)(vi) of the Shareholders' Agreement which sets a purchase price equal to the *lesser of* the Cost Amount or the Fair Market Value as of the date of the Triggering Event.  *See* Motion, Exh. 3, § 6.1(a); Exh. 4, § 6.1(a).  At the minimum, questions remain as to whether ECP is entitled to retroactively terminate him for Cause under Ontario or Texas laws on the after-acquired evidence doctrine.

### D. Questions of Material Fact Exist as to Whether ECP's Redemption of Corporate Shares Constitutes a Conversion

Both the laws of Ontario and Texas recognize that authorized interference with corporate shares is not wrongful and, therefore, cannot amount to a conversion. *See 373409 Alberta Ltd.*, 2002 SC 81; *Lawyers Title Co.*, 424 S.W.3d at 718. Here, ECP was authorized to redeem its corporate shares from BmG/Poley pursuant to the terms of the Shareholders' Agreement signed by BmG/Poley. *See* Motion, Exh 3 at § 6; Motion, Exh. 4 at § 6. Because there was nothing unlawful about ECP exercising its contractual right to redeem the shares, there was no actual conversion.

Poley has not proven as a matter of law that he is entitled to summary judgment on his claims for conversion. Fact issues clearly exist regarding the Shareholders' Agreement, such as whether Poley's conduct precludes ECP's purported breach, when the Trigger Period began, whether Poley's departure is considered a resignation or for cause termination, and the appropriate Trigger Shares Purchase Price. It necessarily follows that there are questions of fact that exist as to whether ECP's redemption of its shares was lawful or unlawful under the agreement.

### E. Granting Poley's Motion Would Defy Public Policy Considerations and Result in an Inequitable, Unjust, and Unconscionable Outcome.

The Supreme Court of Canada has recognized a general organizing principle of good faith, under which "parties generally must perform their contractual duties honestly and reasonably and not capriciously or arbitrarily." *See Bhasin v. Hrynew*, 2014 SCC 71, [2014] 3 S.C.R. 494, ¶ 64 (S.C.C.). This organizing principle "is not a free-standing rule, but rather a standard that underpins and is manifested in more specific legal doctrines and

may be given different weight in different situations." *Id*., at ¶ 64.  This duty of honesty
applies to all contracts and means "simply that parties must not lie or otherwise knowingly
mislead each other about matters directly linked to the performance of the contract." *Id*., ¶
73; *see also C.M. Callow, Inc. v. Zollinger*, 2020 SCC 45, 2020 CarswellOnt 18468 (a
party's behavior in performing contractual obligations must not deceive or mislead the
other party, particularly where such behavior would allow them to unfairly benefit from a
breach); *3 Gill Homes, Inc. v. 5009796 Ontario, Inc.*, 2024 ONCA 6, 2024 CarswellOnt 29
(unconscionability or bad faith could be grounds for judicial intervention if one party
unfairly benefits).  Additionally, while parties are generally afforded the freedom to
contract, "public policy is [ ] fundamental to contract law, both to contractual formation
and enforcement and (occasionally) to the court's relief *against* enforcement." *Tercon
Contractors Ltd. v. British Columbia (Minister of Transportation and Highways)*, 2010
SCC 4, [2010] 1 S.C.R. 69, ¶ 116 (citations omitted).  Indeed, there "may be well-accepted
public policy considerations that relate directly to the nature of the breach [of contract],
and thus trigger the court's narrow jurisdiction to give relief…" *Id*., ¶ 117; *see also Plas-
Tex Canada Ltd. v. Dow Chemical of Canada Ltd.*, 2004 ABCA 309, 245 D.L.R. (4th) 650
(Alta. C.A.) (where defendant was so contemptuous of its contractual obligations as to
forfeit the assistance of the court.)

Texas has likewise adopted equitable principles that grant courts flexibility to
prevent one party from benefitting from a robotic enforcement of contractual terms under
circumstances in which this would produce unfair outcomes.  *See, e.g. James Const. Grp.*,
650 S.W.3d 392 (Texas courts aim to prevent unjust outcomes by weighing factors such as

the breaching party's intention); *DiGiuseppe v. Lawler*, 269 S.W.3d 588 (Tex. 2008) (equity will step in when strict enforcement would result in unfair benefit to one party). In sum, while courts are generally reluctant to alter contract terms, they may do so in situations involving bad faith, unconscionability, or when justice otherwise requires.

Such is clearly the case here. As a Director of ECP, Poley was a fiduciary of ECP, required to act honestly and in good faith with a view to the company's best interests, and was barred from allowing his own personal interests to prevail over ECP's corporate interests or from usurping corporate opportunities. *See In re Brick*, 351 S.W.3d 601, 604 (Tex. App. 2011) ("there is a presumption that, in making a business decision, the directors of a corporation act[] on an informed basis, in good faith, and in the honest belief that the action was taken in the best interests of the corporation"); *Alvi v. Misir*, 2004 O.J. No. 5088, 50 B.L.R. (3d) 175, at ¶ 45 ("directors and officers of a corporation owe their statutory duty of honesty and good faith, that is their fiduciary duty, only to the corporation, always bearing in mind the interests of all the stakeholders…") During his employment and directorship with ECP, Poley was undisputedly given access to ECP's Proprietary and Confidential Information. *See* Exh. F, ¶ 5. Poley used this information to carry out his breach of duties as employee and director of ECP. *See* Exhs. B–E. Poley is *still* operating his competing business venture and continuing to profit from the Confidential and Proprietary Information that he unlawfully took from ECP.

If ECP had not redeemed its shares from BmG/Poley in April 2024, Poley would still have a 20% interest in ECP, still have access to ECP's Proprietary and Confidential Information, and still have a front-row seat to all of ECP's business relations. In other

words, Poley would have an unfettered ability to continue the unlawful actions that have caused harm, and continue to harm, ECP—the equivalent of having a fox in the henhouse. Accordingly, ECP's redemption of shares from BmG/Poley was clearly necessary to protect its business interests.  Thus, granting adjudication on Poley's breach of contract and conversion claims would result in an inequitable, unjust, and unconscionable outcome.

## VI.    **CONCLUSION**

For the foregoing reasons, this Honorable Court should deny Poley's Motion seeking adjudication on his claims for breach of contract and conversion.

Respectfully submitted,

**FISHER & PHILLIPS, LLP**

/s/ *Brett Holubeck*
**BRETT HOLUBECK, ESQ.**
Texas Bar No. 24090891
S.D. No. 3392373
910 Louisiana Street, Suite 4000
Houston, TX 77002
Telephone: (713) 292-0150
Fax: (713) 292-0151
bholubeck@fisherphillips.com

**BUCHANAN INGERSOLL & ROONEY PC**

/s/ *Craig Mills*
**CRAIG D. MILLS, ESQ**. (*Pro Hac Vice*)
PA Bar No. 81331
**JAYME C. BRONSON, ESQ**. (*Pro Hac Vice*)
PA Bar No. 325481
Two Liberty Place
50 South 16th Street, Suite 3200
Philadelphia, PA 19102
Telephone: (215) 665-3863
craig.mills@bipc.com
jayme.bronson@bipc.com

Date:  November 7, 2024

*Attorneys for Plaintiff/Counterclaim Defendant EyeCarePro, Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that, pursuant to Judge Eskridge's Court Procedure No. 18(c), the foregoing Brief in Opposition to Defendant/Counterclaim Plaintiff Steven Poley's Motion for Partial Summary Judgment, not including the case caption, table of contents, table of authorities, signature block, and certificates, has been limited to 4,964 words.

*/s/ Craig Mills*
**CRAIG MILLS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on November 7, 2024, the foregoing Brief in Opposition to Defendant/Counterclaim-Plaintiff Steven Poley's Motion for Partial Summary Judgment was filed and served on the following counsel of record via electronic mail through the Court's ECF system:

David M. Minces
MINCES RANKIN, PLLC
4545 Bissonnet Street, Suite 286
Bellaire, TX 77401
Email: david@mincesrankin.com
Telephone: (346) 701-8563

*/s/ Craig Mills*
**CRAIG MILLS**

21